298 So.2d 319 (1974)
SABINE CONSTRUCTION COMPANY, INC., Plaintiff-Appellant,
v.
CAMERON SEWERAGE DISTRICT NO. 1, Defendant-Appellee.
No. 4588.
Court of Appeal of Louisiana, Third Circuit.
July 26, 1974.
Rehearing Denied August 21, 1974.
*320 Brame, Bergstedt & Brame by John E. Bergstedt, Lake Charles, for plaintiff-appellant.
Jones & Jones by J. B. Jones, Jr., Cameron, for defendant-appellee.
Before HOOD, CULPEPPER and MILLER, JJ.
HOOD, Judge.
Sabine Construction Company, Inc., instituted this suit against Cameron Parish Sewerage District No. 1 to recover the balance alleged to be due on a contract for the construction of a sanitary sewerage system in the town of Cameron, Louisiana. The trial judge rendered judgment for defendant, and plaintiff appealed.
The issue presented involves the interpretation of a "change order" agreed upon and signed by both parties after the original contract had been executed.
In early 1969, the District advertised for bids for the construction of a sanitary sewer system in and for the town of Cameron, Louisiana, including sewer lines, pump stations, an oxidation pond and other work. Two bids were received, the lower bid having been submitted by Sabine for $1,018,291.55. The District had obtained two grants and a loan from Federal agencies for this project, but after considering all funds which were available it determined that it could spend a maximum of about $802,000.00 for the construction of this sewer system. Before action was taken on the bids, therefore, Sabine and the District entered into negotiations seeking to modify the project so that the cost of it would be reduced to an amount within the funds available to the District.
*321 Following these negotiations the parties agreed upon several changes in the contract which reduced the cost of the project to $802,177.10. Sabine and the District thereupon signed a contract, dated June 26, based on the original bid of $1,018,291.55. On the next day, June 27, 1969, they signed a document entitled "Change Order No. 1," which modified the original contract in several respects, reducing the amount to be paid by the District to $802,177.10.
In September, 1969, Sabine began constructing the sewer system in accordance with the contract, as revised by Change Order No. 1. The work was substantially completed in August, 1970, and the contract was formally accepted by the District on October 27, 1970. The District made payments to Sabine from time to time during the construction of the sewer system, and on January 21, 1971, the District paid to Sabine what defendant considered to be the entire remaining balance owed by the District on the contract. Some additional change orders, authorized by the contract, had been issued by the project engineer during the construction, and these changes, according to the District, further reduced the cost of the job. The total sum ultimately paid to Sabine for that work was $794,609.63.
Defendant contends that it has paid the full amount due by it under the contract, as amended by Change Order No. 1. Sabine contends that the additional sum of $73,597.84 is due, and in this suit it demands judgment for that amount.
In the original contract entered into by Sabine and the District, providing for a payment of $1,018,291.55, Sabine agreed to construct the sewer system in accordance with the plans and specifications prepared by Hacket & Bailey, Architects-Civil Engineers. These plans and specifications set out many items required in the construction of a sewer system, several of which involved the installation of sewer lines of various sizes and at different depths. Under the bid proposal and contract, payment for installing the sewer line was based on a "unit price" per linear foot of line installed at different depths. Item 2 of the bid and contract, for example, specified that 22,410 feet of eight inch sanitary sewer was to be installed at depths of four to six feet, and plaintiff agreed to lay that pipe for a "unit price" of $7.50 per linear foot, amounting to $168,075.00 for that item. The total contract price was computed by adding the totals of all of the items in the bid and contract.
Under the original plans, the sewer lines which ran along public rights-of-way were to be installed either in the road side ditches or on the "back slopes" of those ditches. Before the contract was signed, and while the parties were negotiating to reduce the cost, Joseph V. Tantillo, President of Sabine, wrote a letter to the District, dated April 14, 1969, in which he submitted five proposals which he felt would reduce the cost of the project. One of his proposals was:
"4. Move pipe locations from ditch line to roadway shoulders and street surfaces for all parish roads and streets except Davis Street. Asphalts surfaces to be replaced by parish at a later date. Pipe to be installed at a savings of.35/L.F. of line. Approximately 56665 L.F. of 8", 12" and 15" at a deduction of.35 per L.F. of line .......$19,832.75."
Both parties felt that they would benefit by this proposed change. The District would save $19,832.75. And, if the location of the sewer lines were changed from the backslopes of the ditches to the road bed, Sabine would be able to get its equipment to the trenches much easier, it would avoid the expenses of removing and replacing culverts and driveways, it would be relieved of some shrubbery problems, and it would avoid encountering power lines and most utilities. Under this proposal, Sabine also would be relieved of the expenses of *322 repairing the streets damaged by the laying of the sewer lines. The Police Jury of Cameron Parish agreed to make those street repairs, and after the project was completed, the Police Jury actually spent $101,926.50 repairing and overlaying the streets which were involved.
The District Engineer, George V. Bailey, a member of the firm of Hackett & Bailey, wrote to the District on April 14, 1969, formally recommending that several amendments be made in the original contract in order to reduce the cost. One of the recommendations made in that letter was:
"Move pipe locations from ditch line to roadway shoulders and street for all parish roads and streets except Davis Street. Asphalt surface to be replaced by parish at later date. Pipe to be installed at a savings of .35/L.F. of line $19,832.75 Savings.... (Accept and apply savings to cost of 6")."
Following that recommendation, "Change Order No. 1" was signed by both parties on June 27, 1969. It provided several changes in the original contract, including the following:
"All lines along Parish Roads Right-of-ways may be installed on surface of the Roadway as near to the Roadway shoulder as possible. All precautions necessary shall be taken to avoid roadway caving due to open trenches."
The original contract provides that the District would pay to Sabine 90 percent of the value of the work performed during each calendar month, as determined by the District Engineer. Section V of the specifications contains the following additional provisions relating to the payment for furnishing and installing sewer lines:
"Payment for furnishing and installing sewer lines shall be based on the actual number of linear feet installed, measured horizontally from center of manhole to center of manhole."

* * * * * *

"Depth: The depth of a section will be taken as the average of 50 foot intervals between two manholes, and will be the difference between average ground and a point two-tenths (0.2) of a foot below an average invert elevation of that section."

* * * * * *
"Payment for sewer lines will be at the price bid for that particular size and depth."
At the end of each of the months of September, October and November, 1969, Sabine compiled and submitted to the engineer a tabulation showing the number of feet of the various sizes and depths of pipe which had been laid that month. In each instance the District Engineer certified to the District that pipe had been laid at depths different from those claimed in the above mentioned tabulations, and the District paid to Sabine the amounts due for each of those months according to the revised computations of its engineer. Each monthly payment made by the District was less than the amount claimed by plaintiff.
In January, 1970, Tantillo objected to the method used by the District Engineer in measuring the depth at which the pipe had been laid. He contended that the depth should be measured from the surface of the road bed, directly over the pipe which was laid, and that the payments made to Sabine should be based on the "unit price" for laying pipe of that size and type at the actual depths at which it had been installed below the surface of the ground directly over the pipe. The District Engineer contended that the depth should be measured from the average ground level of the backslopes of the ditches, as provided in the original contract, and that payment should be made at the "unit price" for laying pipe of that size and type at those depths, even though Change Order *323 No. 1 authorized some lines to be installed under the road bed instead of under the ditches.
In an effort to resolve that dispute, Tantillo and the District Engineer met in the latter's office on January 19, 1970, and on that date they signed a letter agreement which provides:
"In order to construct these lines at a savings of thirty-five (.35) cents per linear foot, the vertical measurements can only be calculated using the ground elevations for the original locations, and the pipe line inverts. The original line locations were the top of the ditch backslopes." (Emphasis added).
Payment was made to plaintiff for the work done during the month of December according to the calculations of the District Engineer. Thereafter monthly payments were made by the District according to the calculations of its engineer, and plaintiff made no further complaints until after the project had been entirely completed in August, 1970.
On August 31, 1970, Tantillo appeared before the Board of Supervisors of the District at a meeting called for that purpose and, through Sabine's attorney, formal demand was made upon the Board for payment in accordance with measurements taken from the road surface, directly above the location of the pipes. The District rejected that demand. On October 22, 1970, plaintiff, through its counsel, wrote to the District Engineer demanding the extra pay allegedly due it under its interpretation of the contract. Enclosed with that letter was a statement compiled by plaintiff itemizing the work allegedly done by it, and showing that a total of $854,067.75, less amounts already paid, was due on the contract instead of the amount stipulated in Change Order No. 1. The difference in these two figures was due largely to plaintiff's contention that many of the sewer lines were installed at greater depths than those shown in the original contract.
Subsection 2.10 of Section II of the specifications provides that the District, through its engineer, may make alterations in the line, grade, plan of the work, either before or after commencement of construction, and that if such alterations "actually increased the amount of work, such increase shall be paid for according to the quantity actually done, and at the prices stipulated for such work under the contract." Plaintiff contends that the moving of the location of some of the sewer lines to the road bed was a change or alteration which the engineer was authorized to make, and that under the above mentioned provision of the contract plaintiff is entitled to additional compensation because the alteration increased the amount of work.
Plaintiff's demand for payment of this additional amount was rejected by the District. As already noted, the District paid to Sabine on January 21, 1971, the balance which it felt it owed under the contract. This suit was filed on January 26, 1972.
The trial judge found that for payment purposes the depth of the sewer line was to be measured vertically from the average ground elevation of the roadside ditches, as provided in the original plans, and not from the street surfaces as contended by plaintiff. In his reasons for judgment, the judge said:
"I find that it was the intention of the parties to this contract that the vertical measurements for payment purposes were to be made on the basis of actual depth of pipe, but vertically from average ground elevation using the original plans, the roadside ditches, as ground elevation, and not the street surfaces. I hold that the District paid plaintiff correctly and that nothing more is owed." (Emphasis added).
Judgment was rendered by the trial court rejecting plaintiff's demands, and Sabine has appealed from that judgment.
*324 The trial judge considered and apparently attached importance to the letter which was signed by Tantillo and Bailey on January 19, 1970, stating that for payment purposes the various depths of the sewer lines installed by Sabine were to be calculated by using the ground elevations specified in the original plans, that is, the top of the ditch backslopes, instead of the street surfaces. Tantillo claims, however, that that letter agreement is void for several reasons. First, he claims that the District Engineer had no authority to "Change the method of payment" provided in the contract. Second, he argues that such an agreement cannot be binding unless both parties to the contract freely and voluntarily consent to it. And, third, he contends that he did not voluntarily sign the letter, but that instead he was coerced into signing it, and that the agreement thus is invalid.
We think the District Engineer had authority to bind the District under the terms of the above letter agreement. His authority to do so is found in Section II, Subsection 2.18, of the Specifications, which contains the following provisions:

"Engineer's Status: To prevent disputes and litigations, the Engineer shall in all cases determine the amount, quality, acceptability and fitness of the several kinds of work and materials which are to paid for under this contract; shall determine all questions in relation to said work and the construction thereof, and shall in all cases decide every question which may arise relative to the fulfillment of this contract on the part of the Contractor, and in case any question shall arise between the parties hereto, touching this contract, such estimate and decisions shall be a condition precedent to the right of the Contractor to receive any money under this contract.
"The Engineer shall make all necessary explanations as to the meaning and intention of the specifications, shall give all orders and directions contemplated therein or hereby and in every case in which a difficult or unforeseen condition shall arise in the performance of the work required by this contract."
The evidence convinces us that Tantillo signed the letter freely and voluntarily. The facts are that Sabine was experiencing financial difficulties on January 19, 1970. The District Engineer informed Tantillo at that time that he could not certify an estimate as to the work which had been performed during the preceding month which was in dispute. Bailey also informed Tantillo that if they were unable to agree as to how the measurements were to be made, then he would have to stop progress until the question could be settled by the Sewerage Board or until the contract was amended again to keep the cost within the available funds. We agree that Bailey's refusal to certify to the correctness of plaintiff's estimates prevented Sabine from getting paid for work performed in December, until an agreement was reached or the contract was changed. The question presented, however, is whether the acts and statements of Bailey were sufficient to constitute coercion and thus whether the letter agreement was void because of lack of consent of Sabine.
We have found that the estimate of work performed in December which was submitted by plaintiff was not in accord with the amended contract. Bailey thus was justified in refusing to certify to the correctness of that estimate. We believe that if an agreement had not been reached he would have been justified in stopping further work on the project until the dispute was settled, or the Sewerage Board directed otherwise. If he had allowed the work to continue despite the disagreement, the District might have become committed to pay more than the amount which was available to it.
The record does not show that Sabine would experience an appreciable delay in *325 getting the Sewerage Board to consider the question, or that it would suffer an injury because of that delay. Plaintiff concedes that under the contract "the job engineer had the right to withhold payments until the dispute was resolved," but it argues that his action in doing so in this case was "unjust and illegal," and that because of plaintiff's financial condition it had the effect of forcing Tantillo to sign the letter against the latter's will. Plaintiff suggests that the engineer could have certified a "partial payment" until the issue could be resolved by the Sewerage Board. That may be true, but we are concerned here with the question of whether Sabine was coerced into signing the letter agreement, or whether Tantillo's signature in that letter was not free and voluntary.
We believe that Tantillo had ample opportunity to consider the issue which was presented, that in view of the above mentioned dispute the engineer was justified in refusing to certify the amount of work which had been performed, and that Sabine had an adequate recourse by submitting its demand to the Sewerage Board. Our conclusion is that Sabine was not coerced into signing the letter, that Tantillo's signature on that letter was free and voluntary, and that the trial judge did not err in considering that document.
We turn now to the principal question presented, and that is: Did the parties intend that, for the purpose of computing payments, the depths of the sewer lines installed on roadways were to be calculated by using the average ground elevation of the backslopes of the ditches, as provided in the original contract, rather than the surface of the roadways directly over the pipes?
Agreements legally entered into have the effect of laws on those who have formed them. LSA-C.C. art. 1901. The courts are bound to give legal effect to all contracts according to the true intent of the parties. That intent is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences. LSA-C.C. art. 1945.
Contracts must be interpreted to achieve the intent and result intended by the parties thereto. When such intent is clear and express in the agreement itself, the terms of the contract prevail. Where contract provisions are ambiguous, unclear or uncertain, attending circumstances may be shown to remove the ambiguity or uncertainty. Grace v. Morales, 210 So.2d 60 (La.App. 1 Cir. 1968); Clause v. Broussard, 146 So.2d 828 (La.App. 3 Cir. 1962).
In case of doubt or ambiguity as to the meaning of the provisions of a contract, the document must be interpreted against the person or party who prepared or drafted the contract. LSA-C.C. art. 1957; Louisiana Paving Company v. Louisiana Department of Highways, 205 So.2d 445 (La.App. 1 Cir. 1967).
A contract clause providing that the architect or engineer shall be the final arbitrator of disputes is binding upon parties unless the architect or engineer's decision is manifestly arbitrary or rendered in bad faith. J. H. Jenkins Contractor, Inc. v. City of Denham Springs, 216 So.2d 549 (La.App. 1 Cir. 1968).
Applying these rules to the facts in this case, we conclude that the parties intended that the payments due for laying the sewer lines should be based on depth measurements from the ground level as provided in the original contract, that is, from the backslopes of the ditches, and not from the surface of the road.
When Tantillo wrote to the District on April 14, 1969, submitting several proposals for reducing the cost of the project, he was aware of the fact that the District did not have funds sufficient to enable it to enter into the original contract. Every suggestion contained in that letter, including proposal No. 4 that some of the lines *326 be moved to the roadway shoulders, was designed to reduce the cost of constructing the sewer system. In that letter he stated that the moving of the sewer lines to the road bed would effect a saving of exactly $19,832.75 to the District. He arrived at that figure by multiplying the length of the lines which were to be moved (56665 linear feet) by $.35, the latter figure being the savings per linear foot which was to be effected by that change. Tantillo must have known that the roadway shoulders, or the surface of the streets, would be higher than the backslopes of the ditches and that deeper trenches thus would have to be dug in order to lay the pipe at the same elevations. He could not reasonably have assumed that the elevation of the roadway would be exactly the same as the backslopes of the ditches, or that the engineer would raise some of the sewer lines so that those installed on road beds would be exactly the same depth from the surface of the road as they would have been from the backslope of the ditch. By specifying that the contract price would be reduced by the exact sum of $19,832.75, it is apparent that plaintiff intended to reduce the cost by thirty-five cents per linear foot for the line installed on the road bed, regardless of the additional depth involved, and that the payments due for installing those lines were to be calculated by using the same depths as had been specified in the original contract, that is the depths were to be measured from the backslopes of the ditches. In no other way could he have arrived at a savings of that amount.
Although Tantillo suggested that some of the sewer lines be moved to the road bed for the specific purpose of reducing the cost of the contract, plaintiff's position in this suit is that the proposed change, after being accepted by the District, actually served to increase the cost of the contract substantially. The District and its engineer unquestionably thought that by moving some lines to the road bed, as suggested by plaintiff, it would save the amount stated in Tantillo's letter. If the District had entertained any question as to that saving, it at least would have made additional surveys to determine how much the relocating of the lines would affect the cost. It is apparent, therefore, that in executing Change Order No. 1, the District intended that payment for installing lines on the road bed would be paid for as testified by its engineer. We have already determined that plaintiff also intended that the change would effect that savings when the change order was signed. There was a meeting of the minds, therefore, and we think it is clear that the intent of the parties was that by moving some of the lines to the road bed the District would save thirty-five cents per linear foot, for a distance of 56665 feet, amounting to $19,832.75.
We have considered plaintiff's argument that the change in the location of sewer lines provided in Change Order No. 1 was simply a change authorized by Subsection 2.10 of Section II of the Specifications (referred to earlier in this opinion), and that the Specifications provide that where such changes increase the amount of work, the contractor is entitled to additional compensation for it.
We do not consider Change Order No. 1 as being simply a change authorized by that section of the contract. We regard it as a separate agreement entered into by the parties which modified the original contract.
Our conclusion is that under Change Order No. 1, payments for installing sewer lines on road beds are to be based on depths computed by using the backslopes of the ditches, as provided in the original plans, and not the street surfaces. That conclusion is supported by the letter agreement entered into between Tantillo and the District Engineer on January 19, 1970, in which the parties agreed that payments were to be determined in that manner.
*327 In view of the conclusions which we have reached, it is unnecessary for us to consider the issues raised relating to the accuracy of the statement prepared by plaintiff and submitted to the District Engineer on October 22, 1970, or the issues relating to the accuracy of a survey which plaintiff had made prior to the institution of this suit.
We think the trial judge correctly interpreted the contract, and that there is no error in the judgment appealed from.
For the reasons herein set out, the judgment appealed from is affirmed. The costs of this appeal are assessed to plaintiff-appellant.
Affirmed.